UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

JERMAINE WASHINGTON,

                    Plaintiff,

         -vs-                              **No. 1:13-CV-00617(MAT)**
                                           **DECISION AND ORDER**

SECURITAS SECURITY SERVICES USA,
INC.,

                    Defendant.

―――――――――――――――――――――――

## I.   Introduction

     Proceeding *pro se*,    plaintiff   Jermaine Washington
("plaintiff"), a current employee of defendant Securitas Security
Services USA, Inc. ("defendant" or "Securitas"), brings this
employment discrimination action pursuant to Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.*, asserting claims
of racial discrimination and retaliation. Presently before the
Court is defendant's motion for summary judgment. Doc. 67. For the
reasons set forth below, defendant's motion is granted.

## II.  Factual Background and Procedural History

     The following material facts are taken from the parties'
submissions in connection with this motion and from the record in
the case. Plaintiff, who is Black,[1] began working at Securitas'
Buffalo branch ("the Buffalo branch") in July 2008. From that time
until approximately January 6, 2012, plaintiff worked as a road

―――――――――――――――――

     [1] Plaintiff's motion papers use the term "Black" and defendant's papers use
the term "African American." The Court will defer to the term used by plaintiff,
as it is unclear that all of the employees to whom defendant refers as "African
American" are actually of African descent.

patrol officer.[2] In his capacity as road patrol officer, plaintiff's duties included "handling calls, making patrols, response to alarms, providing coverage if a security officer at a site was out, and completing paperwork, including payroll." Doc. 67-9, Dec. of Roslyn Bindemann (Bindemann dec.), at ¶ 3.

At the time he was hired, plaintiff signed Securitas' Applicant Agreement and an Employee Handbook Acknowledgment, both of which stated that plaintiff's employment was at-will. On April 18, 2009, plaintiff signed an "Employment Standards Acknowledgment" which stated, among other things, "I understand that I can expect transfers among facilities from time to time, which may include varying locations, hours, and/or changes in rates of pay, based upon the client contract and business needs of [Securitas]. I understand that work schedules are not guaranteed and that a work week may vary as required by Securitas." Doc. 67-7 at 4.

At the Buffalo branch, the road patrol unit is typically comprised of three to four employees. Each of these employees first completed field training, and then training on how to use the employee payroll system (known as "SAFES"). Securitas describes payroll functions as second only to road patrol functions in a road patrol officer's hierarchy of duties. According to Securitas,

---

[2] In the spring of 2009, plaintiff was promoted to the higher-paying position of lead road patrol officer. He quit after approximately three weeks, after an "incident . . . took place, which [] prompted [him] to go back to just regular road patrol." Doc. 67-4 at 7 [Plaintiff depo. at 29]. Plaintiff does not allege that this "incident" constituted discrimination.

training an employee on the SAFES system took approximately two to three weeks. Plaintiff does not dispute that payroll was one of his primary job duties.

In September 2011, the Buffalo branch experienced some personnel changes. Jeffrey Jackson, who had supervised plaintiff in the position of scheduling manager, was terminated. Jackson, who is Caucasian, was replaced in that position by Joseph Wooley, who is Black. Although plaintiff interviewed for the scheduling manager position vacated by Jackson, Wooley was hired because he had more relevant experience. Frantz St. Jean, who was Black and a branch manager at the Buffalo branch, was also terminated in September 2011. Plaintiff describes the transition as "huge office turnover . . . creating a backlog of payroll which amounted to 72 sites and excess 250 employees['] payroll" requiring processing in the SAFES system "the Thursday ending the week of September 29, 2011." Doc. 70 (manually filed), Plaintiff's Opposition to Summary Judgment (P. Opp.), at 2.

Also in September 2011, two Caucasian employees, John Montanaro and Dennis Steiner, were hired as road patrol officers. Thus, during the time frame from on or about September 11, 2011 through mid-October 2011, the road patrol unit consisted of Wooley, plaintiff, Montanaro, and Steiner.[3] Neither Wooley, Montanaro, nor Steiner were trained to enter payroll until approximately mid-

---

[3] Plaintiff testified that Steiner quit after about one week, but it is unclear from the record at what point Steiner ceased employment with Securitas.

October; therefore, plaintiff was the only road patrol employee who could perform payroll responsibilities during that timeframe.

When Wooley was promoted to scheduling manager instead of plaintiff, branch manager Roslyn Bindemann offered plaintiff the higher-paying position of lead road patrol officer. Plaintiff declined, however, and told Bindemann that "since [he] was not considered for the scheduling manager position, [he] would like to be placed at a site with comparable pay or . . . a higher paying site." Doc. 67-4 at 7 (Plaintiff depo. at 28-29).[4] Plaintiff testified that Bindemann responded that she would "make sure [this] was done." Id. Plaintiff "mention[ed] to . . . Bindemann that [plaintiff] had met with . . . Jeffrey Jackson about going to the Buffalo Sewer Authority ["BSA"]." Plaintiff depo. at 79. He "didn't name FedEx specifically" as a site to wish he desired transfer. Id. at 39.

During the September - October 2011 time frame discussed above, plaintiff and his supervisors exchanged several emails regarding plaintiff's payroll responsibilities. Plaintiff expressed frustration that he was required to complete payroll responsibilities with no help from other members of the road patrol unit, while at the same time being expected to complete his road patrol responsibilities. Wooley, who supervised Montanaro, Steiner, and plaintiff, had not yet been trained on payroll himself, and as

---

[4] Plaintiff's deposition was submitted in two parts, as docket numbers 67-4 (pp. 1-161) and 67-5 (pp. 162-325). References to plaintiff's deposition will hereinafter be to "Plaintiff depo. at __."

it was Wooley's responsibility to train Montanaro and Steiner, they similarly lacked the knowledge necessary to complete payroll tasks. Wooley and Bindemann attempted to account for plaintiff's extra responsibilities in payroll by decreasing some of his road patrol duties. See doc. 67-7 at 26, 29.

On October 1, 2011, Bindemann sent an email which stated, as relevant to plaintiff's claims:

> DENNIS [Steiner] AND JOHN [Montanaro] NEED TO LEARN [payroll]. I NEED THEM TO GO ON TO SAFES AND LEARN THE SYSTEM. . . .
>
> JERMAINE [PLAINTIFF] – UNTIL THEY LEARN – IT WILL BE YOUR RESPONSIBILITY TO DO THIS AND I WILL NOT BE SCHEDULING ANOTHER OFFICER IN ON THE SAME DAY LIKE LAST WEEK – IF YOU NEED TO COME IN ON THURSDAY NIGHT AGAIN TO FINISH IT – ONE NIGHT WILL BE TAKEN AWAY FROM YOU DURING THE WEEK.
>
> I AM DEAD SERIOUS ABOUT GETTING THIS TASK DONE.

Id. at 29 (emphasis in original). Bindemann testified that, by this email, she meant that she "would take a day away, but [she] would never dock any pay. [She] would substitute it for a day, so that [plaintiff] could work on the Thursday and not work another day and put somebody else in there." Doc. 67-6 at 22 [Bindemann depo. at 86].[5]

Plaintiff testified that he "was totally put back by this e-mail," which he saw as "threatening" because it was "in all caps." Plaintiff depo. at 200-01. He testified that he believed the "e-

---

[5] Docket number 67-6 contains the depositions of Wooley (doc. 67-6 at pp. 2-7), human resources manager Lisa St. Jean (id. at 9-12), and Bindemann (id. at 14-25). The Court will refer to these depositions hereinafter by name of deponent and page number in the original deposition transcript.

mail showed discrimination" because "[Steiner] and [Montanaro, both of whom were Caucasian] were not given that same mandate." Id. at 201. According to plaintiff, Bindemann's email discriminated because it "[gave Steiner and Montanaro] the choice of learning [payroll] rather than tasking them with the mandate of learning it, and also ensuring that they immediately learned it." Id. Plaintiff's repeated emails to Wooley, Mary Martino (a branch manager), and Bindemann did not mention or complain of discrimination. When questioned as to whether he ever complained of discrimination to Securitas, plaintiff testified that "all of the e-mails [he] sent to management were about asking for assistance." Id. at 219.

About three weeks into October 2011, Wooley and Montanaro learned how to use the payroll system. At that point, Steiner was no longer working at Securitas. As a result of his increased payroll responsibilities, during September-October 2011, plaintiff worked approximately 33 hours in overtime. Plaintiff's motion papers aver that "[t]he two Caucasian[] co-workers['] payroll training was postpone[d] just to intentionally create stress for the [p]laintiff and bombard [p]laintiff with payroll." P. Opp. at 3. Plaintiff argues that it was Bindemann's responsibility to complete payroll processing, but she instead made plaintiff "complet[e] all the payroll without any assistance, making it a stressful situation for the [p]laintiff." Id.

In the meantime, on October 1, 2011, four Caucasian employees were assigned to work at the BSA site. Bindemann avers that she did not have any input into that decision. Rather, these employees were transferred because the site to which they were previously assigned had been closed, and if they had not been transferred, they would have been terminated.

In December 2011, an employee "abruptly" left Securitas' FedEx work site. Bindemann dec. at ¶ 9. Richard Bartowiak, who had been a "floater" employee of Securitas, was chosen for the newly vacant position because "every site to which he was assigned had nothing but exemplary things to say about him." Id. Plaintiff does not dispute that he did not apply for the FedEx position. However, he "made mention to [Wooley] . . . that [Bartowiak] had been appointed site supervisor at the Fedex site and that he [made a higher hourly wage than plaintiff]." Plaintiff depo. at 41. Wooley told plaintiff that he was "working on" plaintiff's assignment to a different and higher-paying site. Id. at 245.

Soon after, Martino offered plaintiff a position at Securitas' BSA site, to begin January 16, 2012. The BSA site was the highest-paying client account in the Buffalo branch; the position increased plaintiff's hourly pay rate from $11.00 to $15.75. Plaintiff accepted the offer, and in early January 2012 plaintiff began training his replacement, Colin Davis, who was Black. Wooley advised plaintiff that after Davis completed his training, he would

take over plaintiff's road patrol schedule. Davis took over plaintiff's schedule on January 6, 2012.

On January 6, 2012, plaintiff met with Martino and human resources manager Lisa St. Jean, who advised that in order to proceed with his transfer he would be required to sign a security officer handbook acknowledgment and a New York State offer letter, which was required by the client, Buffalo Sewer Authority. Plaintiff initially refused to sign the documents, telling Martino that he was reluctant to do so because the documents described the position as "at-will." Plaintiff testified that Martino then "became confrontational," "pointed her finger in [his] face," "threaten[ed] him with termination," and "asked [him] five times did [he] want to be terminated right now." Plaintiff depo. at 25. Plaintiff testified that he believed this was "harassment" and "retaliation." Id.

Plaintiff eventually signed the required documents, but he crossed out a paragraph in the handbook acknowledgment referring to "at-will" employment. Above his signature on the acknowledgment, he wrote, "I understand Securitas' at-will provision, but I do not agree [with it]." Doc. 67-7 at 45. At the bottom of the New York State offer letter, which also contained an at-will provision, plaintiff wrote, "I Jermaine Washington signed this document under protest." Doc. 67-7 at 47. Bindemann called plaintiff to inquire why he made these notations and inquired as to whether he still

wished to work at the BSA site, which he confirmed. Plaintiff was transferred to the BSA site despite his notations on the documents.

On January 10, 2012 plaintiff wrote to Bindemann asking whether he should report for his usual road patrol shift on January 11, to which Bindemann replied that he should report only to the BSA on January 16, 2012, the start date for his new position. Plaintiff complains that his removal from road patrol caused him to lose four days' pay, or 28 hours at $11.00 per hour. Plaintiff began his new position at the BSA on January 16, 2012, and is still employed in that position. He testified that following his transfer to the BSA, he "was not subjected to discrimination or retaliation." Plaintiff depo. at 60.

Plaintiff filed charges of discrimination with the EEOC in November 2011 and December 2011, which charges were dismissed in March 2012. Plaintiff filed the instant action on June 13, 2013, alleging that Securitas discriminated and retaliated against him on the basis of race. Specifically, plaintiff alleges that Securitas discriminated against him (1) by increasing his payroll responsibilities during September - October 2011; (2) by failing to transfer him to a BSA position in October 2011 and to the FedEx position in December 2011; and (3) by Bindemann's October 1, 2011 email. He alleges that Securitas retaliated against him when (1) Martino threatened to terminate him for refusing to sign the employee handbook acknowledgment and New York State's offer letter;

and (2) he lost compensation pending his transfer to the BSA work site. Defendant has filed a motion for summary judgment, and for the reasons discussed below, that motion is granted.

## III. Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has met this burden, the burden shifts to the nonmovant who must "come forward with evidence to allow a reasonable jury to find in his favor." Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex, 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007), quoting Fed. R. Civ. P. 56(c).

Where, as here, the party opposing summary judgment proceeds *pro se*, the Court must "read the pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest."

10

Corcoran, 202 F.3d at 536. However, "proceeding *pro se* does not otherwise relieve [the plaintiff] from the usual requirements of summary judgment." Fitzpatrick v. N.Y. Cornell Hosp., 2003 WL 102853, *5 (S.D.N.Y. Jan. 9, 2003).

## IV.   Discussion

### A.   Discrimination

A plaintiff must establish an initial prima facie case of discrimination under Title VII of the Civil Rights Act. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). "To establish a prima facie case of racial discrimination under Title VII, a claimant must show that: '1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" Cordell v. Verizon Commc'ns, Inc., 331 F. App'x 56, 58 (2d Cir. 2009) (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003).

If the plaintiff establishes a prima facie case, the burden of production then shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for the employment decision. Id. Once the employer has met this burden, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the nondiscriminatory reason was merely pretext for discrimination. Id. at 804-05. The ultimate burden of persuasion is always on the

11

plaintiff, who must demonstrate that the employer's action was prompted by an impermissible motive. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511–12 (1993).

For the reasons that follow, the Court finds that plaintiff has not met his burden, and therefore his complaint is dismissed with prejudice.

### 1.   Increased Payroll Responsibilities

Plaintiff contends that Securitas discriminated against him when his payroll responsibilities increased temporarily in September - October 2011. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citing Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir. 1999)). A "materially adverse change" is one that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya, 202 F.3d at 640. Examples of a materially adverse change are "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id.

Here, plaintiff claims that he suffered a materially adverse employment action when his existing responsibility of entering

payroll was temporarily increased over an approximate two-month period. However, "[i]ncreased responsibilities and excessive scrutiny, without more, do not constitute an adverse employment action." Workneh v. Pall Corp., 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012) (citing Dauer v. Verizon Commc'ns Inc., 613 F. Supp. 2d 446, 461 (S.D.N.Y. 2009) (observing that "[c]ourts in this circuit have found that reprimands . . . and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation")). Plaintiff suffered no decrease in pay, and he received pay for approximately 33 hours of overtime. He has failed to establish that this temporary increase in responsibilities constituted an adverse employment action. See Bell v. Metro. Transp. Auth., Triborough Bridge & Tunnel Auth., 2013 WL 8112461, *4 (S.D.N.Y. Nov. 1, 2013) ("Bell's increased responsibilities were temporary, having been removed when she complained, and were not a demotion, She cannot point to any evidence of discrimination."); DeMars v. O'Flynn, 287 F. Supp. 2d 230, 246 (W.D.N.Y. 2003) ("At most, plaintiff's assignment on the day shift was a temporary change in duties that she found inconvenient."). Because plaintiff has failed to establish a prima facie case with respect to this claim, it is dismissed.

### 2.   Failure to Promote

Plaintiff argues that Securitas discriminatorily denied him promotions in the form of transfers to higher-paying job sites. Specifically, he contends that he was denied promotions (1) in October when four Caucasian employees were transferred to the BSA site and (2) in December when a Caucasian employee was transferred to the FedEx site. Plaintiff states that he had a conversation with Jeffrey Jackson in August 2011 in which he expressed an interest in a transfer to the BSA site. In September 2011, he told Bindemann about that conversation with Jackson and stated that he wished to be placed in a position at a higher-paying site. Plaintiff apparently faults Bindemann for not notifying him, of her own volition, when the October 2011 positions became available at the BSA site.  In response to defendant's argument that plaintiff could not be transferred in October 2011 because of the turnover in his road patrol unit, plaintiff argues that he "could have been transferred . . . [because] Bindemann should have properly and correctly trained Wooley[, Steiner, and Montanaro] on payroll." Id. According to plaintiff, Bindemann chose not to train anyone on payroll to purposely bombard [p]laintiff with payroll timesheets just to inflict punishment and stress on the [p]laintiff." Id.

Plaintiff also argues that Bindemann failed to notify him of the availability of the FedEx position. According to plaintiff's reasoning, once he and Bindemann discussed, in September 2011, that

14

he wished to transfer to a higher-paying job site, Bindemann was required to place him into the first higher-paying position that became available. See P. Opp. at 13 ("Bindemann is knowledgeable of which sites are higher paying sites. Bindemann was aware that FedEx was a higher paying site. Bindemann was to place [p]laintiff at the FedEx site based on the conversation [he] had with Bindemann on September 22, 2011 . . ."). However, plaintiff acknowledges that Bindemann offered him the higher-paying position of lead road patrol officer, but he did not accept the promotion. He apparently faults Bindemann for offering him the wrong position because lead road patrol officer was "a position that Bindemann knew in the past [p]laintiff had resigned from." P. Opp. at 12.

In order to establish a prima facie case of failure to promote, plaintiff must establish that "(1) []he belongs to a protected class; (2) []he applied for and was qualified for a job promotion for which the employer was seeking applicants; (3) []he was rejected despite her qualifications; and (4) the promotion was given to someone not a member of h[is] class." Muszak v. Sears, Roebuck & Co., 63 F. Supp. 2d 292, 297 (W.D.N.Y. 1999). Arguably, plaintiff was not required to establish the application element because he has alleged that the vacancies were not posted and that he had no way of knowing about the vacancy before it was filled. See, e.g., Ludwiczak v. Hitachi Capital Am. Corp., 528 F. Supp. 2d 48, 57 (D. Conn. 2007).

15

Nevertheless, even if plaintiff has made out a prima facie case, defendant has proffered legitimate, non-discriminatory reasons for not giving plaintiff the transfers. Defendant argues that plaintiff was not given the October 2011 transfer to the BSA because, as discussed above, plaintiff was needed in his road patrol unit as the only employee who could complete payroll. Defendant also argues that the four individuals selected for the BSA transfer were uniquely positioned for the transfer because the location to which they were assigned was closing and without transfer, they would be otherwise unemployed. As to the December 2011 transfer to FedEx, defendant argues that it was given to Richard Bartowiak because he was particularly qualified, as he had been a "floater" with a good working record.

Plaintiff has not presented evidence "sufficient to permit an inference that [Securitas'] reasons were false *and* that discrimination was the real reason [for its actions]." <u>Taylor v. Local 32E Serv. Employees Int'l Union</u>, 118 F. App'x 526, 528 (2d Cir. 2004) (emphasis added). In order to do so, plaintiff must establish that the individuals actually selected for the transfers were similar to him "in all *material* respects." <u>Id.</u> (quoting <u>Shumway v. United Parcel Service, Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997) (emphasis supplied in <u>Taylor</u>)); see also <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53-54 (2d Cir. 2001). Plaintiff has presented no such evidence.

16

Moreover, plaintiff has presented no other evidence establishing "circumstances that would be sufficient to permit a rational finder of fact to infer that the [Securitas'] employment decision was more likely than not based in whole or in part on discrimination." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (alteration in the original) (internal quotation marks omitted); see also Zephyr v. Ortho McNeil Pharm., 62 F. Supp. 2d 599, 606 (D. Conn. 1999) ("[A] plaintiff cannot survive a motion for summary judgment merely by asserting that intent is at issue, instead, he must present 'concrete particulars' that substantiate his claim of discrimination."). The fact that Securitas transferred plaintiff to the higher-paying BSA site shortly after the incidents here in question tends to belie an inference of discrimination rather than support one. See, e.g., E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 895 (S.D.N.Y. 2013) (holding that fact that employee's "total intended compensation increased after returning from pregnancy further belie[d] an inference of discrimination or claim of pretext"). Accordingly, this claim is dismissed.

### 3. October 1, 2011 Email

Plaintiff contends that Bindemann's October 1, 2011 email, stating she was "dead serious," was discriminatory and that her "decision to continue to give a directive for [p]laintiff to continue to complete all payroll [was] abusive, bias[ed], and discriminatory, threatening in her decision making." P. Opp. at 17.

According to plaintiff, "Bindemann purposely created a stressful working environment" for him. Id. He also argues that the email "[t]hreaten[ed] to take a day away from [him]." Id. at 20. Plaintiff has not, however produced any evidence, that Bindemann's email was motivated by a racial bias. Even according to his own allegations, her motive was merely hostile, and not based on his race.

Regardless, plaintiff cannot demonstrate that he incurred any materially adverse employment action in connection with the email. As discussed above, his increased payroll responsibilities did not constitute an adverse employment action. The same reasoning applies to the October 1, 2011 email, which had no effect on the terms and conditions of his employment. See, e.g., O'Hazo v. Bristol-Burlington Health Dist., 599 F. Supp. 2d 242, 258 (D. Conn. 2009) ("O'Hazo has not demonstrated that the written reprimand resulted in an alteration of the terms or conditions of his employment or that these actions put his position in jeopardy.") (citing Stembridge v. City of New York, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (finding that plaintiff had not established an adverse employment action where he failed to show that a reprimand had "a cognizable or material impact on the terms or conditions of his employment"); Valentine v. Standard & Poor's, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir.2000) ("Negative evaluations alone, without any accompanying adverse

result, however, are not cognizable. . . . . Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment.")). Therefore, this claim is likewise dismissed.

### B.    Retaliation

To establish a prima facie case of retaliation under Title VII, plaintiff must show: "'[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).

### 1.    Threat to Terminate

Here, plaintiff claims that he was retaliated against when Martino threatened to terminate him after he initially refused to sign forms required for his transfer to the BSA work site. Plaintiff, however, has failed to establish, or even allege, that this threat led to any employment action disadvantaging him. In order to make such a showing, plaintiff must demonstrate "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53, 68 (2006).

19

Courts have routinely found the type of threat of which plaintiff complains to be insufficient to establish a prima facie case of retaliation. See, e.g., Vazquez v. Southside United Hous. Dev. Fund Corp., 2009 WL 2596490, *12 (E.D.N.Y. Aug. 21, 2009) ("Courts interpreting Burlington Northern have held that empty verbal threats do not cause an injury, and therefore are not materially adverse actions, where they are unsupported by any other actions.") (citing Harris v. South Huntington Sch. Dist., 2009 WL 875538, *19 (E.D.N.Y. Mar. 30, 2009) (finding no material adverse action where supervisor allegedly asked plaintiff to resign after he complained about other employees); Pugni v. Reader's Digest Ass'n, Inc., 2007 WL 1087183, *23 (S.D.N.Y. Apr. 9, 2007) (threats that plaintiff's days at company "were numbered" were not viewed as materially adverse action where threat was never executed)). Therefore, this claim is dismissed.

### 2. Loss of Compensation

Finally, plaintiff argues that he was retaliated against when he lost four days of compensation pending his January 2012 transfer to the BSA site. Securitas argues that the "loss of compensation" of which plaintiff complains was an incident of his transfer to the BSA site, during which transition work schedules are sometimes temporarily disturbed. See Bindemann dec. at ¶ 12 ("Although Securitas tries to make sure that there will be no schedule disruption when an employee transfers to a new position or site, it

cannot guarantee that there will not be any work lapses."). Indeed, when plaintiff began working at Securitas, he acknowledged by his signature that he "underst[ood] that work schedules are not guaranteed in that a work week may vary as required by Securitas." P. Opp. at 9.

Plaintiff has failed to establish that his disruption in work schedule as a result of his transfer to the higher-paying BSA site was in any way causally related to his protected action of filing EEOC complaints. See Briggs v. Mercedes-Benz Manhattan, Inc., 2006 WL 2789927, *9 (S.D.N.Y. Sept. 27, 2006) (citing Uddin v. City of New York, 427 F. Supp. 2d 414, 433 (S.D.N.Y. 2006) ("[Plaintiff] has . . . failed to establish any evidence establishing a link between the [alleged adverse employment action] and his alleged protected activity. . . . Therefore, even assuming [plaintiff] suffered an adverse employment action by virtue of being denied a promotion, he has failed to establish that such denial was a result of retaliatory animus."); Kearney v. County of Rockland, 373 F. Supp. 2d 434, 446 (S.D.N.Y. 2005) ("[P]laintiff has submitted no evidence which could lead a trier of fact to reasonably conclude that any of the alleged adverse employment actions occurred in retaliation against plaintiff for filing [her] [c]omplaint.")). Accordingly, this claim is dismissed.

## V.    Conclusion

For the reasons stated above, defendant's motion for summary judgment (doc. 67) is granted. Plaintiff's complaint is dismissed in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


**S/Michael A. Telesca**

_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:     November 22, 2016
           Rochester, New York.